# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **RAYMOND E. HALL,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 04 C 2967 |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | Martin C. Ashman |
| **JO ANNE B. BARNHART,** | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Pursuant to 42 U.S.C. § 405(g), Plaintiff, Raymond E. Hall, seeks judicial review of the final decision of Defendant, the Commissioner of Social Security Administration ("SSA"), who determined that Plaintiff was not entitled to Disability Insurance Benefits ("DIB"). Before this Court is Plaintiff's Motion for Summary Judgment, which requests this Court to reverse the Administrative Law Judge's ("ALJ") decision that Plaintiff was not entitled to DIB and remand Plaintiff's case for further determination of his disability. The Commissioner's Motion for Summary Judgment, which requests this Court to affirm the ALJ's decision, is also before the Court. The parties have consented to have this Court conduct any and all proceedings in this case, including the entry of final judgment. *See* 28 U.S.C. § 636(c); Local R. 73.1(a). For the reasons set forth below, this Court grants Plaintiff's motion.

## I. Procedural History

On August 29, 2000, Plaintiff applied for disability insurance benefits (DIB), alleging disability as of February 1, 1994. Plaintiff's application was denied initially and on reconsideration. (R. at 129-30.) On January 5, 2001, Plaintiff amended his alleged onset of disability date to December 1, 2000. (R. at 140-41.) And on February 5, 2001, Plaintiff requested a hearing before an ALJ. (R. at 143.) After two incomplete hearings in July and December 2002, a full hearing was conducted on February 13, 2003, before ALJ Steven H. Templin. At the February 2003 hearing, the ALJ heard testimony from: Plaintiff, who was represented by counsel; William Newman, M.D., a medical expert; and Ms. Julie Bose, a vocational expert ("VE"). (R. at 70-128.) On February 28, 2003, the ALJ rendered his decision and found Plaintiff not disabled at step five of his five-step inquiry. (R. at 34-45.) On March 5, 2004, the ALJ's decision became the Commissioner's final decision when the SSA Appeals Council denied Plaintiff's request for review. (R. at 8-10.)

## II. Background Facts

### A. Plaintiff's Background

Plaintiff was born on June 28, 1951, (R. at 213), and was forty-nine years old on December 1, 2000. Plaintiff's education culminated in a GED, which he earned in December 1975. (R. at 224.) From December 1973 until March 1994, Plaintiff worked at Statesville Correctional Center in Joliet, Illinois ("SCC"). (R. at 219.) Plaintiff was initially hired as a corrections officer but he worked his way up to correctional captain and shift supervisor (a position he held for ten years). (R. at 114, 219.) After leaving SCC in

- 2 -

March 1994, Plaintiff worked as a mall security guard from March 1997 to June 1997, (R. at 219), and for the U.S. Census in late 1999. (R. at 111.) Plaintiff only held the U.S. Census job for about four days. (Id.)

**B.    Medical Evidence**

Plaintiff has consistently complained of back pain. In late August 2000, physicians at Chicago's Louis A. Weiss Memorial Hospital recorded Plaintiff's complaints of chronic back pain as well as burning pain in his back and side. (R. at 271.) The physicians noted that Plaintiff has scoliosis and had not undergone any corrective procedures for it. (R. at 272.) The physicians gave Plaintiff a prescription for Motrin to help alleviate his pain. (R. at 273.) On September 25, 2000, Plaintiff went to Cook County Hospital complaining of back pain. (R. at 278.) X-rays were taken of Plaintiff's spine that same day. (R. at 280, 303.) The x-rays revealed that: "There is severe S-shaped scoliosis of L-spine. Anterior osteophytes are seen at T11-T12 and superior endplate of L3 and L4. Disc spaces are grossly unremarkable. There is compression deformity of T11-T12, may be due to severe scoliosis." (R. at 280.) Following the x-rays, Plaintiff was prescribed Ultram to help alleviate his pain.

On October 6, 2000, Fauzia A. Rana, M.D., an SSA physician, met with Plaintiff for thirty minutes. (R. at 284-86.) Dr. Rana noted Plaintiff's scoliosis of the spine, possible degenerative arthritis and lumbosacral radiculopathy, and limitations of flexion of the spine due to pain. (R. at 286.) Dr. Rana reported that Plaintiff had no difficulty of movement but complained of some discomfort in his back on various movements. (R. at 285.) Also on October 6, 2000, Terry J. Burk, M.D., examined x-rays of two views of Plaintiff's lumbar spine

- 3 -

and completed a radiologist report. Dr. Burk noted mild degenerative changes at multiple levels with disc narrowing and small marginal osteophytes. (R. at 289.) Dr. Burk's impressions were: (1) No acute bone or joint abnormalities, (2) scoliosis, (3) mild multilevel spondylosis. (Id.) Two weeks later, state agency Disability Determination Service ("DDS") physicians Bruce Donnelly, M.D., and Jason Hutchison, M.D., completed a physical residual functional capacity ("RFC") form for Plaintiff. (R. at 290-97.) The DDS physicians noted Plaintiff's scoliosis and limited flexion in his spine, (R. at 292), concluded that Plaintiff's complaints of pain were credible and consistent with his scoliosis, (R. at 297), and restricted Plaintiff to light work. (Id.)

Plaintiff continued to complain of back pain in 2001. Plaintiff refilled a prescription for pain medication on March 26, 2001. (R. at 346.) On April 9, 2001, Plaintiff went to Cook County Bureau of Health Services' Fantus Clinic and met with Christopher J. DeWald, M.D., regarding his scoliosis and back pain. (R. at 298-99.) A September 4, 2001 MRI of Plaintiff's spine revealed scoliosis and degenerative changes. (R. at 326.) Specifically, the MRI revealed: (1) prominent S-shaped thoracolumbar scoliosis with levoscoliosis of the lumbar spine, (2) no evidence of spondylolisthesis, (3) disc space narrowing at T11-12, (4) disc space narrowing right of midline at L2-3 and L3-4, (5) disc degeneration at T11-12, L2-3, L3-4, and L5-S1, (6) marginal osteophytes at several levels, (7) disc bulging at L2-3, L3-4, L5-S1, (8) and a small disc protrusion noted centrally and to the left of midline resulting in mild deformity of the ventral thecal sac. (Id.) Plaintiff returned to Cook County Hospital in November 2001 with complaints of chronic back pain in his lower back and right leg and was prescribed medication for his pain. (R. at 333-36.) Plaintiff renewed these prescriptions on December 21, 2001. (R. at 344.)

Plaintiff was examined by physicians at the Hayes Family Health Center on multiple occasions in 2002. Records from the Hayes Family Health Center indicate that, in January and March of 2002, Plaintiff complained of ongoing lower back pain, muscle spasms and scoliosis, (R. at 306-13), and stated that his medication failed to alleviate his pain. (R. at 310.) On August 13, 2002, Plaintiff returned to Cook County Hospital's Emergency Services Department with complaints of back pain. (R. at 328-32.) Plaintiff was prescribed Naprosym, Tylenol and Roboxim and referred to an orthopedic back specialist. (R. at 329.)

On August 29, 2002, the Commissioner (through the ALJ) sent Plaintiff to James P. Elmes, M.D., for an orthopedic consultative examination. (R. at 58, 314-24.) Dr. Elmes spent approximately ninety minutes with Plaintiff, which included performing the examination, reviewing medical records and forms, and formulating and dictating an evaluation report. (R. at 314.) Dr. Elmes reported that Plaintiff complained of back and neck pain. (R. at 314-15.) On a scale from one to ten, Plaintiff rated his pain between five (on good days) and eight (on bad days). (Id.) Plaintiff claimed that his back pain is aggravated by weather changes, lifting, bending and twisting. Plaintiff claimed that rest and medication help alleviate some of his back pain. (R. at 315.) Plaintiff also complained of neck and shoulder pain, which is aggravated by twisting and direct pressure on his neck. Dr. Elmes reviewed Plaintiff's medical record, as well as x-rays taken earlier that day. The August 29, 2002 x-rays revealed:

> right thoracic left lumbar scoliosis of the apex of lumbar curve at about T12/L1 level producing a maximum curvature of 43°. There is decreased vertical height of left one-half of the disc spaces at the T11/T12 levels. Cartilage space of hip joints and sacroiliac joints all appear well maintained. Lateral view reveals decreased vertical height of disc spaces at T11, L2 and L3 with associated adjacent spurring. No evidence of spondylolisthesis. Diagnosis: 1) Right thoracic

- 5 -

left lumbar scoliosis. 2) Degenerative disc disease at the thoracolumbar level, especially T11, L2 and L3 levels.

(R. at 315-16.) During the examination, Plaintiff's gait was normal but he complained of low back pain and right shoulder pain. (R. at 316.) Plaintiff's motor skills were normal and his strength was good to normal. (Id.) Dr. Elmes noted decreased range of motion in Plaintiff's spine, hips and knees, (R. at 316, 324), and some tenderness in Plaintiff's neck and shoulder. (R. at 316.) Dr. Elmes concluded that Plaintiff could: (1) lift less than ten pounds; (2) stand/walk for two hours out of an eight hour day; (3) stand for thirty minutes continuously; (4) push/pull up to six pounds; (5) occasionally use ramps and stairs; (6) never use ladder, rope or scaffolding; and (7) never kneel, crouch or crawl. (R. at 318.) Dr. Elmes also concluded that Plaintiff had limited ability to reach in all directions (including overhead), tolerate extreme temperatures, work with machinery or at heights. (R. at 319.)

Plaintiff was treated for lower back pain at Cook County Hospital in September 2002, December 2002, and February 2003. (R. at 349-77.) Medical records from September 27, 2002 note Plaintiff's lower back pain and the results of his x-rays and MRI and state, "will refer to orthopedic surgery." (R. at 349.) Surgical options were also discussed in December 2002, when Plaintiff once again met with Dr. DeWald. (R. at 372.)

### C.    Plaintiff's Testimony

Plaintiff was represented by counsel and testified at the February 13, 2003 hearing. Plaintiff described his pain for the ALJ. According to Plaintiff he suffers terrible back pain that sometimes feels like "a sledgehammer hitting [him] in the back . . . other times it's like a hammer

just pounding and aching." (R. at 105.) Plaintiff claims that he did not experience back pain until he was in his forties. (R. at 107.) At the time of the hearing, Plaintiff had been seeing doctors and taking medication for back pain for about ten years. (R. at 106.) Plaintiff claims that all of his attempts to alleviate his pain have failed. (R. at 108.) Furthermore, Plaintiff claims that his pain moves around to his arms and upper back. (Id.) Plaintiff claimed that sometimes the pain is so bad that he must stop what he is doing and sit down or stretch. (Id.) Plaintiff testified that his back pain also causes him to suffer headaches and experience nausea. (R. at 117.)

Plaintiff claims that, as a result of his back pain, he cannot: (1) stand in one place for more than fifteen minutes; (2) walk more than a block; (3) lift heavy objects; (3) bend; (4) climb stairs; or (5) reach overhead. (R. at 110-11.) According to Plaintiff, pain also makes it difficult for him to maintain his balance or sit for prolonged periods of time. (R. at 112.)

Plaintiff claims that in December 2002 spine surgeons at Cook County Hospital suggested putting rods into his spine and front to support his back. (R. at 105.) As of the February 2003 hearing, Plaintiff had not yet decided whether to go forward with this surgery because it would take months to recover from the operation and he would still need to take pain medication. (Id.) Plaintiff claims that December 2002 was the first time he was told that implanting rods might help his back. (R. at 106.)

Plaintiff described the corset he used to control his back pain. According to Plaintiff, the corset does not have any metal in it and it is not the thoracolumbar spinal orthosis (TLSO) back brace that Dr. Newman described as the standard brace for spinal conditions. (R. at 95, 108.)

Plaintiff said he wore the corset for a short while but stopped wearing it because it was increasing his back pain. (R. at 108.)

Plaintiff discussed his work history. Plaintiff worked at SCC for twenty-two years. (R. at 114.) During those years, Plaintiff worked his way up from correctional officer to correctional captain and shift supervisor. (Id.) Plaintiff ultimately left the SCC job because the physical demands, whether walking around the facility or getting physical with inmates, caused him too much pain. (R. at 115.) Plaintiff next spent three or four months working as a security guard at a mall. (R. at 112-13.) At that job, Plaintiff worked three to four hours per day, three to five days per week. (R. at 113.) Plaintiff lost that job when the mall closed. Plaintiff claims that he can no longer work as a mall security guard because the position requires too much walking. (R. at 116.) Finally, Plaintiff testified that he worked for the 2000 Consensus in 1999. Plaintiff only held this job for about four days because the amount of walking necessary for the job caused him too much pain. (R. at 111-12.)

Plaintiff described his pain and his pain-killing medication. Plaintiff complained that his medications cause drowsiness, dizziness, and headaches, and prevent him from driving and from getting to work on time. (R. at 116.) Plaintiff does not perform housework, spends much of the day lying down, but can usually microwave food and dress himself without a problem. (R. at 117-18.) Sometimes Plaintiff has difficulty dressing and grooming himself. (R. at 118.)

An hour and twenty minutes into the February 2003 hearing, Plaintiff claimed that he was in pain and rated the severity of his pain as six out of ten. (R. at 119.)

**D.      Medical Expert's Testimony**

Dr. William Newman, a medical expert, testified at the February 13, 2003 hearing. Dr. Newman believed that Plaintiff's scoliosis, degenerative disc condition and back and hip pain may have been triggered by a gunshot wound Plaintiff received in 1979. (R. at 76.) Dr. Newman also believed that Plaintiff may have had scoliosis since his youth. Then, relying on the medical records in evidence, Dr. Newman attempted to evaluate Plaintiff's scoliosis.

Dr. Newman questioned the reliability of Dr. Elmes' examination. Dr. Newman noted ambiguities in the x-ray reports and in Dr. Elmes examination. The x-ray reports suggest that the apex of Plaintiff's dorsal scoliosis is down low in the dorsal lumbar junction and that the left lumbar is a compensatory curve. (R. at 75.) Dr. Elmes' found this curve to be forty-three degrees, a finding that Dr. Newman found significant. As an initial matter, Dr. Newman noted that Dr. Elmes did not use the traditional Cobb method for measuring a scoliosis. (Id.) Dr. Newman also stated that forty-three degrees is "very mild" for a scoliosis. (Id.) Dr. Newman found this measurement to be inconsistent with reports that Plaintiff's scoliosis is prominent. (Id.) Dr. Newman claimed that his assessment of Plaintiff's condition was limited by the lack of tests performed on Plaintiff's scoliosis. (R. at 76.) Dr. Newman stated that, if Plaintiff's scoliosis is in fact visible, it may be greater than forty-three degrees. (R. at 78.)

Dr. Newman believed that Plaintiff's back pain may be caused by scoliosis, but could also be caused by Plaintiff's degenerative disc condition, specifically by degeneration of Plaintiff's L5 disc. (R. at 77.) Dr. Newman suggested that Plaintiff had not aggressively sought medical treatment for his back pain, was surprised that Plaintiff had not consulted a spine specialist, and believed that many unanswered questions about Plaintiff's condition could be quickly answered

by a thorough examination of his spine. (R. at 77.) Dr. Newman suggested that some basic information on Plaintiff's condition would clarify the exact nature of Plaintiff's problem and whether Plaintiff was taking appropriate steps to alleviate his pain. For example, based on Plaintiff's description, Dr. Newman suspected that Plaintiff had used a corset for back support, which might be less effective than a TLSO back brace. (R. at 93-95.) Dr. Newman suggested that surgery is an option in severe cases and stated that, "[t]he borderline for surgery is 60 to 70 degrees." (R. at 80.)

Dr. Newman asserted that Plaintiff's impairments, singly or in combination, do not meet or equal in severity the criteria of any listed impairment. Dr. Newman then testified to Plaintiff's exertional limitations and found that Plaintiff is: (1) markedly restricted in his ability to bend and twist; (2) restricted in his ability to perform sustained overhead work for more than one third of the workday, but capable of temporarily reaching overhead; (3) capable of lifting twenty pounds occasionally and ten pounds frequently; (4) capable of pushing and pulling with his legs; (5) capable of walking and standing at least six hours per eight hour work day; (6) capable of kneeling frequently, crouching and crawling often, but no stooping; and (7) capable of sitting for a total of six hours in an eight hour work day, but ideally never for more than two hours continuously. (R. at 86-92.) Additionally, Plaintiff should not be exposed to vibration (e.g., driving a truck on a bumpy road), should avoid hazards (dangerous machinery and unprotected heights), and should avoid extreme temperatures. (R. at 92.) According to Dr. Newman, Plaintiff's spine is not decompensated and the top and bottom of the spine are essentially aligned and in balance, (R. at 85-86), a view not entirely shared by Dr. Elmes and a significant reason for the differences between the two doctors' conclusions.

- 10 -

Dr. Newman disagreed with Dr. Donnelly and Dr. Hutchison's assessment of Plaintiff's pain. Dr. Newman believed that Plaintiff's complaints of pain over the years were consistent with a herniated disc and probably not the result of his scoliosis. (R. at 96-98). Dr. Newman noted that Dr. Elmes found one of Plaintiff's legs to be longer than the other and suggested this could be causing Plaintiff's pain in his left leg. (R. at 119-20.) This made sense to Dr. Newman because Plaintiff's curvature is to the right. (R. at 120.) Accordingly, Dr. Newman believed that Plaintiff's scoliosis is a "red herring" and not the real cause of Plaintiff's pain. (Id.)

Dr. Newman did not believe that Plaintiff's structural problems are commensurate with the degree of pain reported by Dr. Rana. (R. at 98-99.) According to Dr. Newman, nothing in Plaintiff's medical record explained why he was experiencing pain after standing or sitting for a few minutes. (R. at 99.) Dr. Newman stated that a disc bulge at L5 could cause Plaintiff's alleged radiating symptoms down both lower extremities, (R. at 101-102), though not with the frequency or intensity complained of by Plaintiff. According to Dr. Newman, Plaintiff's MRI revealed this sort of bulging at L5. (R. at 103.)

### E. Vocational Expert's Testimony

Ms. Julie Bose, a VE, testified at the February 2003 hearing. The VE testified that Plaintiff's former work at SCC is classified by the Dictionary of Occupational Titles as light in physical demand but from a practical viewpoint is heavy in physical demand due to the need to restrain assailants and inmates. (R. at 122.) The VE stated that Plaintiff's positions at SCC would have started out at a Specific Vocational Preparation level of five (corrections officer requiring six to twelve months of training) and eventually reached a Specific Vocational

Preparation level of seven (captain in corrections with administrative and supervisory responsibilities requiring more than a year of training). Due to Plaintiff's need to avoid hazards, the VE did not believe that Plaintiff could return to his previous employment with SCC. (R. at 123.) The VE did not consider Plaintiff's work for a mall or the 2000 Census to be successful attempts at work. (R. at 122.)

The VE testified that Plaintiff has skilled and semi-skilled vocational skills transferable to other occupations within his RFC, as described by Dr. Newman. (R. at 123.) That RFC allowed for light work activity with a sit-stand option, which includes positions as security gate attendant, monitor security guard. (Id.) The VE opined that Plaintiff could perform light, unskilled work, such as general office clerk, order caller and mail clerk. (R. at 123-24.) The VE stated that the Chicago metropolitan area (a six-county area that includes Cook County) contains 12,000 to 14,000 general office clerk positions, 3,000 to 4,000 order caller positions, and 8,000 to 10,000 mail clerk positions. (R. at 124.)

Plaintiff's attorney asked the VE about employer tolerance for time off task, specifically with regard to production quotas and absenteeism. (R. at 125.) The VE stated that the various security positions would not accommodate any time off task. (R. at 125-26.) The VE believed that the other positions would tolerate up to ten minutes off task each hour. (R. at 126.) None of the positions would tolerate tardiness (reporting to work more than ten minutes late) more than three times in a four-week period. (Id.) As for absenteeism, the VE stated that the various positions would tolerate about five excused absences (with notes from medical facilities and physicians) and five unexcused absences in a twelve-month period. (R. at 126-27.)

## III.   ALJ's Findings

The ALJ made the following specific findings:

1.   The claimant met the disability insured status requirements of the
Act on the amended, alleged disability onset date of December 1,
2000, and continued to meet those requirements only through
December 31, 2000.

2.   The claimant did not engage in any substantial gainful activity after
the amended, alleged, disability onset date of December 1, 2000.

3.   The claimant has established the existence of at least one,
medically determinable, severe impairment, or its equivalent.

4.   The medical evidence does not establish that the claimant's
medically determinable impairments, even in combination, meet or
equal, in severity, any in Appendix 1, Subpart P, Regulations
No. 4.

5.   The claimant's allegations of symptoms associated with his
established impairments have been considered in the assessment of
his residual functional capacity, but for the reasons explained in the
body of this decision, his allegations concerning the intensity,
frequency, and duration of those symptoms are not credited.

6.   The claimant retains the functional capacity to perform the
exertional and nonexertional requirements of work except for more
than occasionally lifting and/or carrying up to 20 pounds at a time,

- 13 -

or 10 pounds frequently; siting for more than two hours at a time; even occasionally stooping, twisting, balancing, or climbing ropes, ladders or scaffolds; more than occasionally performing overhead work tasks, crouching, crawling, or climbing ramps and stairs; more than frequently kneeling; or working with objects or in environments that would expose the claimant to vibration or hazards.

7.  The claimant is unable to perform his past relevant work.

8.  The claimant was a younger individual at all times on and prior to the expiration of his insured status. He is now closely approaching advanced age.

9.  The claimant has the equivalent of a high school education.

10. The claimant has acquired work skills which are transferable to other semi-skilled work within the established residual functional capacity.

11. If the claimant could perform the full range of light, unskilled work, considering his age, education, and transferable work skills, medical-vocational rules 202.15 and 202.22, Table No. 2, Appendix 2, Subpart P, Regulations No. 4, would direct a conclusion of "not disabled."

12. Notwithstanding the claimant's additional limitations, there is other work existing in significant numbers in the national economy to

which the claimant could be expected to make a vocational adjustment and perform on a sustained basis. Examples of such work are the occupations of general office clerk, order caller, and mail clerk. In the local economy, there are approximately 12,000 to 14,000 general office clerk jobs, approximately 3,000 to 4,000 order caller jobs, and approximately 8,000 to 10,000 mail clerk jobs. These jobs exist in the local economy as well as in several regions of the national economy.

13.    The claimant was not "disabled," within the meaning of the Act, at any time material to this decision, including on or before the expiration of his insured status on December 31, 2000.

(R. at 43-44.) The ALJ then concluded that, "based upon the application filed on August 29, 2000, the claimant is not entitled to a period of disability or to disability insurance benefits under §§ 216(i) and 223, of the Act." (R. at 45.)

## IV.  Discussion

Plaintiff applied for DIB benefits under sections 216(i) and 223, of the Social Security Act. Section 223 of the Social Security Act provides for the payment of DIB to a person who is insured for disability insurance benefits, has not attained retirement age, has filed a DIB claim and is under a disability (as defined by the Act). 42 U.S.C. § 423(a). The statutory standard for disability is the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" that has lasted or can be expected to last for a

continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The statutes further define inability to "engage in any substantial gainful activity" as, not only unable to do his previous work but, unable to engage in "any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). The determination of disability involves a five-step process that considers both medical and vocational factors. The five steps are:

Step 1: Is the claimant engaged in substantial gainful work activity? If yes, the claimant is not disabled. If no, the inquiry proceeds to step two.

Step 2: Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least twelve months? If no, the claimant is not disabled. If yes, the inquiry proceeds to step three.

Step 3: Does the claimant's severe impairment meet or equal the severity of an impairment listed in the appendix of 20 C.F.R. § 404, Subpt. P, App. 1? If yes, the claimant is disabled. If no, the inquiry proceeds to step four.

Step 4: Can the claimant still perform past relevant work? If yes, the claimant is not disabled. If no, the inquiry proceeds to step five.

Step 5: Can the claimant make an adjustment and perform other work? If yes, the claimant is not disabled. If no, the claimant will be found disabled.

20 C.F.R. § 404.1520(a)(4)(i)-(v). *See Herron v. Shalala*, 19 F.3d 329, 333 n.8 (7th Cir. 1994). At the fourth and fifth steps of the five-step inquiry, the ALJ must consider an assessment of Plaintiff's RFC. The RFC is an assessment based upon all of the relevant evidence of what

- 16 -

Plaintiff can still do despite his limitations. 20 C.F.R. § 404.1545(a). In other words, the RFC is the most Plaintiff can do, not the least. Id. The RFC assessment helps to evaluate the types of work available to an individual with particular limitations. Id. The final responsibility for deciding Plaintiff's RFC rests with the ALJ. 20 C.F.R. § 404.1527(f)(2).

Plaintiff bears the burden of proof through step four of the five-step inquiry; the burden shifts to the Commissioner at step five. *Herron*, 19 F.3d at 333 n.8. Plaintiff's burden of proof includes providing medical evidence substantiating the assertion of disability. *Luna v. Shalala*, 22 F.3d 687, 693 (7th Cir. 1994). If the ALJ determines that Plaintiff is not disabled at any step of the five-step inquiry, the inquiry ends without proceeding to the next step. 20 C.F.R. § 404.1520(a)(4)(i)-(v). The ALJ weighs the medical and testimonial evidence presented and, when he denies benefits, he must build a logical bridge from the evidence to his conclusion. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

Section 205(g) of the Social Security Act grants federal courts the authority to review final decisions of the Commissioner with the power to affirm, modify, or reverse, with or without remand to the Commissioner for a rehearing. 42 U.S.C. § 405(g). The scope of this review is limited. This Court may not reweigh evidence, resolve conflicts in the record, decide questions of credibility or substitute our own judgment for that of the Commissioner. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Rather, this Court will affirm the ALJ's decision if it is supported by substantial evidence. *Id*. Evidence is considered substantial if a reasonable person would accept it as adequate to support the ALJ's conclusion. *Id*. Thus, if reasonable minds could disagree on whether Plaintiff is disabled, we must affirm the ALJ's decision denying benefits. *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000).

## A.    The ALJ Denied Plaintiff Benefits at Step Five.

In this case, the ALJ proceeded through all five steps of the five-step inquiry and denied Plaintiff's claim at step five. (R. at 42-43.) At step five, the burden is on the ALJ to provide evidence that shows the existence of other work that Plaintiff can do consistent with his RFC and vocational profile. *Herron*, 19 F.3d at 333 n.8. Based on the medical evidence and hearing testimony, the ALJ determined that Plaintiff has a RFC to perform the exertional and nonexertional requirements of work with certain limitations that are listed above. (R. at 40, 44.) The ALJ found that Plaintiff has acquired work skills that are transferable to semi-skilled work within his RFC. (R. at 44.) The ALJ concluded that Plaintiff can perform work existing in significant numbers in the national economy. (Id.)

Plaintiff challenges the ALJ's findings on multiple fronts. Plaintiff argues that the ALJ: (1) failed to consider 20 C.F.R. Pt. 404, Subpt. P, App. 1, 1.00L, the SSA's listing for scoliosis; (2) erred in accepting the conclusions of Dr. Newman, who did not examine Plaintiff, over the conclusions of Dr. Elmes, who did examine Plaintiff; and (3) erroneously rejected Plaintiff's credibility and complaints of pain. (Pl.'s Br. at 11-14.) The Commissioner rejects all of Plaintiff's arguments.

## B.    The ALJ Analyzed Relevant Listings at Step Three.

At step three of his five-step inquiry, the ALJ determined that Plaintiff did not show that his impairments met or equaled the criteria of Section 1.04 of the Listing of Impairments, nor the criteria of any in the Listing of Impairments. (R. at 39.) Plaintiff argues that the ALJ erred when

he failed to explicitly analyze Plaintiff's impairments within the context of Sections 1.00L and 14.09(B), which focus on scoliosis and related medical problems.

When considering an appeal from the SSA, the reviewing court is primarily concerned with tracing the ALJ's logic and reasoning. Thus, while an ALJ's failure to explicitly refer to a relevant listing alone does not necessitate remand, *Rice v. Barnhart*, 384 F.3d 363, 369-70 (7th Cir. 2004), remand may be necessary where failure to explicitly refer to a relevant listing is combined with a perfunctory analysis. *See Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003). It is imperative, therefore, that the ALJ explain why the plaintiff failed at step three and not simply repeat that medical examiners found no listings were met or equaled. *Rice*, 384 F.3d at 370 (reversal and remand are necessary where ALJ "omits reference to the applicable listing and provides nothing more than a superficial analysis"); *Brindisi*, 315 F.3d at 786 ("failure to discuss or even cite a listing, combined with an otherwise perfunctory analysis, may require a remand."); *Scott v. Barnhart*, 297 F.3d 589, 595-96 (7th Cir. 2002) (ALJ must sufficiently articulate assessment of the evidence in order to ensure reviewing court that important evidence was considered and that an accurate and logical bridge exists between the evidence and the ALJ's conclusion).

In his decision, the ALJ focused on Section 1.04 and found that the listings were not met. Significantly, Plaintiff's attorney pressed very hard for Section 1.04 and argued, in detail and in no uncertain terms, that Section 1.04 was met. (R. at 197-200.) When an applicant for social security benefits is represented by counsel, the ALJ is entitled to assume that the applicant is making his strongest case for benefits. *Glenn v. Sec'y of Health and Human Servs.*, 814 F.2d 387, 391 (7th Cir. 1987). Such an assumption appears to have been warranted in this case.

- 19 -

While the record does not suggest that Plaintiff's impairments meet Sections 1.00L or 14.09(B), the record (and especially Dr. Newman, upon whom the ALJ relied heavily) provides evidence of degenerative disc disease, which is addressed by Section 1.04. Ultimately, the ALJ assessed and rejected this listing in a manner that allowed this Court to trace the ALJ's logic and reasoning. In his decision, the ALJ specifically found that Plaintiff suffers scoliosis, the functional impact of scoliosis upon Plaintiff is mild, and the only measurement taken of the curvature of Plaintiff's spine was not in accordance with generally accepted protocol. (R. at 39-40.) The ALJ noted that all of this evidence was assessed by Dr. Newman, who found that the listings were not met, (id.), and the ALJ agreed with that conclusion. (Id.)

Plaintiff concedes that his impairments do not meet those set out in the listings, (Pl.'s Reply at 6), but argues that explicit discussion and consideration of Section 14.09(B) by the ALJ would have "produced a relevant framework from which to consider the credibility of [Dr. Newman's] testimony characterizing [Plaintiff's] scoliosis as very mild and minimizing its significance overall." (Pl.'s Br. at 12.) Under Section 1.00L, the ALJ may consult Section 14.09(B) for equivalency purposes where a claimant suffers scoliosis and subsequently suffers mobility problems. The listings under Section 14.09(B) require medical finding of ankylosing spondylitis or other spondyloarthropathy established by findings of unilateral or bilateral sacroiliitis with both (1) history of back pain, tenderness and stiffness, and (2) ankylosis of the dorsolumbar or cervical spine at forty-five degrees or more of flexion measured from the vertical position. Plaintiff reasons that if Section 14.09(B) defines a forty-five degree curvature of the spine as presumptively disabling, then Plaintiff's (albeit unconventional) forty-three degree curvature must be indicative of a significant disability. (Pl.'s Reply at 6.)

The ALJ's failure to discuss Sections 1.00L and 14.09(B) is not a legal error. At step three of the analysis the burden is on the claimant to show that he is presumptively disabled because he suffers an impairment equivalent to one of the SSA's listings. The record shows that Plaintiff made his strongest arguments in an attempt to show a listing was met, but those arguments were rejected. Plaintiff now identifies another relevant but admittedly unmet listing that he believes is persuasive evidence supporting the credibility of his complaints of pain. The Court will not speculate as to whether an unmet listing may have persuaded the ALJ to reconsider his decision to find Plaintiff's scoliosis not severe and Plaintiff's complaints of pain not credible. That said, the ALJ will have another opportunity to consider the relevancy of Sections 1.00L and 14.09(B), as the Court remands this case for further consideration of Plaintiff's complaints of pain for the reasons set out below.

### C.    The ALJ Considered Competing Medical Opinions.

Plaintiff argues that the ALJ erred when he rejected the conclusions of Dr. Elmes in favor of the conclusions of Dr. Newman. Plaintiff claims that Dr. Elmes' opinion is entitled to more weight because, unlike Dr. Newman, he examined Plaintiff. (Pl.'s Br. at 13.) Furthermore, Plaintiff alleges that Dr. Newman's conclusions contained significant flaws and were inconsistent with other evidence of record and are therefore entitled to less weight under 20 C.F.R. § 404.1527(d). (Pl.'s Br. at 13-14.)

"An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). As stated above,

evidence is considered substantial if a reasonable person would accept it as adequate to support the ALJ's conclusion. *Young*, 362 F.3d at 1001. This rule does not apply, however, where an examining physician's opinion is contradicted by both examining and nonexamining physicians. *Id.* at 1001-02; *Gregory v. Barnhart*, No. 03 C 9381, 2004 WL 2496489, at *2 (N.D. Ill. Nov. 4, 2004).

Dr. Elmes and Dr. Newman gave conflicting opinions on Plaintiff's status. In August 2002, Dr. Elmes examined Plaintiff and concluded that Plaintiff suffers degenerative disc disease and scoliosis and has a forty-three degree curvature of the spine.[1] (R. at 315-16.) Dr. Elmes found that Plaintiff's ailments resulted in pain and significant restrictions on his RFC. Dr. Newman questioned the severity of Plaintiff's scoliosis, as Dr. Elmes' forty-three degree measurement was not taken in accordance with the generally accepted protocol and a forty-three degree curvature neither indicates severe nor prominent scoliosis. (R. at 75.) Furthermore, Dr. Newman found no neurological deficits, (R. at 79), nor any pathology of Plaintiff's knees or hips, (R. at 84), and highlighted the lack of definitive laboratory studies. (R. at 39.) Dr. Newman went on to disagree with some of Dr. Elmes' RFC limitations. Specifically, Dr. Newman explained that lack of decompensation of Plaintiff's spine suggested that standing and walking and frequently lifting and carrying more than ten pounds and occasionally twenty

---

[1] The Commissioner challenges the relevancy of Dr. Elmes' examination, as it followed Plaintiff's last date of disability insurance and Plaintiff suffers a degenerative disease of the spine. This relevancy challenge fails and Dr. Elmes' examination must be considered by the ALJ. *Halvorsen v. Heckler*, 743 F.2d 1221, 1225 (7th Cir. 1984) ("There can be no doubt that medical evidence from a time subsequent to a certain period is relevant to a determination of a claimant's condition during that period."). That Plaintiff suffers a degenerative disc disease, while relevant to the significance of certain evidence (especially with regard to timing), does not change this fact.

pounds should not be difficult. (R. at 85.) As for restrictions on Plaintiff's ability to sit during an eight-hour day, the ALJ found that Dr. Elmes had not been specific about how much time Plaintiff could sit at one time. (R. at 87.) Dr. Newman agreed with Dr. Elmes' finding that Plaintiff must alternate sitting and standing and found that Plaintiff could sit for up to two hours at a time. (R. at 88.) Dr. Newman found that Plaintiff would not be very limited with the lower extremities because Plaintiff can walk and stand on a normal basis. (R. at 90.) Additionally, it was Dr. Newman's opinion that Plaintiff could kneel and crawl without difficulty because those activities would not put stress on his back. (R. at 91.) Dr. Newman believed that Plaintiff's complaints of radiating pain in both hips were most likely caused by a disc bulge and not scoliosis and were less intense and frequent than alleged by Plaintiff. (R. at 102.) Dr. Newman also noted that no testing had been done to determine if Plaintiff has problems with his hips. (R. at 104.)

The ALJ relied more heavily on Dr. Newman's RFC assessment than Dr. Elmes' because he found Dr. Newman's analysis to be more comprehensive and thorough. As the ALJ states in his decision, Dr. Newman had the benefit of an expanded record when he testified that Plaintiff's impairments did not meet or equal the listings. (R. at 40-41.) Furthermore, Dr. Newman "thoroughly explained on the record why the diagnostic and severity criteria of § 1.04 were not met or equaled." (R. at 39.) The ALJ found Dr. Newman's conclusions regarding the functional impact of Plaintiff's scoliosis to be consistent with his own observations of Plaintiff at three separate hearings, (R. at 39), as well as generally in accord with the medical opinions of record.[2]

_____

[2] The ALJ states that, "All of the medical opinions of record are in accord: the claimant does not have an impairment, or combination of impairments, that meets or equals the criteria of
(continued...)

(R. at 40.) For example, Dr. Rana, who examined Plaintiff in October 2000, found Plaintiff's

scoliosis to be slight to moderate, and found some complaints of spinal discomfort but no

limitation of motion of any joint, normal gross and fine manipulation of both hands, motor power

4/5 all over, and satisfactory gait. (R. at 285-86.) Additionally, both Dr. Newman and the ALJ

were struck by Plaintiff's failure to aggressively seek pain medication or consultations with

specialists. (R. at 41.) Thus, it appears that some examining physicians did not agree with

Dr. Elmes' conclusions and that some evidence supported Dr. Newman's conclusions. *Compare

to Gudgel*, 345 F.3d at 470 (decision remanded where no medical inconsistencies between

examining physician's conclusion and medical record were identified except for nonexamining

physician's "unsupported opinion" which, moreover, was based on "questionable" analysis of

medical reports). It follows that the ALJ did not err when he chose to rely more heavily on

Dr. Newman's conclusions that those generated by Dr. Elmes.

Next, Plaintiff challenges the significance of Dr. Rana's findings. Plaintiff claims that

Dr. Rana performed a thirty minute internal medicine examination, not a ninety minute

orthopedic examination, so her report does not deserve the same weight as Dr. Elmes' report.

Furthermore, Plaintiff contends that medical evidence, such as a September 2000 x-ray and

September 2001 MRI, contradict Dr. Rana's conclusion that Plaintiff's scoliosis is less than

severe. (Pl.'s Reply at 8.)

The ALJ is responsible for examining the entire medical record, weighing competing

evidence, and accepting or rejecting evidence proffered by the parties. Under 20 C.F.R.

---

[2](...continued)
any in the Listing of Impairments." (R. at 40.)

§ 404.1527(d), the expertise of the examining physician, as well as the length and focus of Plaintiff's examination affect the weight given to each physician's opinions. 20 C.F.R. § 404.1527(d). In this case, Dr. Elmes conducted a more focused and longer examination than did Dr. Rana. The ALJ found it significant, however, that Dr. Rana not only examined Plaintiff in the relevant functional areas but did so at an earlier and more critical period in time, given the degenerative nature of Plaintiff's disc disease, than did Dr. Elmes. (R. at 42.) While there were some inconsistencies between Dr. Rana's findings and the September 2000 x-rays, Dr. Newman highlighted the discrepancies for the ALJ at the July 11, 2002 hearing and advised that the angles of Plaintiff's scoliosis must be measured in order to clarify the severity of the scoliosis. (R. at 52-53.) This recommendation led to the consultation with Dr. Elmes and his nonstandard measurements of Plaintiff's scoliosis. The ALJ took issue with the nonstandard measurement of Plaintiff's spine, as well as with Dr. Elmes' failure to substantiate the degree of pathology supportive of his limitation finding and Dr. Elmes' failure to explain why he found Plaintiff's complaints concerning the intensity, frequency and duration of pain credible. (R. at 41-42.)

Given the ALJ's findings, neither Dr. Rana nor Dr. Elmes' opinion is entitled to controlling weight because (1) both Dr. Elmes and Dr. Rana produced meaningful but not conclusive medical reports and (2) neither Dr. Elmes nor Dr. Rana was Plaintiff's treating physician.[3] Left with competing medical evidence, the ALJ evaluated and weighed the differing medical examinations, as well as the other evidence in the record and made his decision. The ALJ never states that one opinion is given more weight than the other, though his decision makes

---

[3] Dr. Elmes' report specifically states that his examination of Plaintiff does not constitute an examination by a treating physician. (R. at 314.)

clear that the timing of the examinations was relevant to his evaluation. The ALJ explains that Dr. Newman helped clarify several issues and that he found his testimony to be reliable. In sum, the ALJ received several pieces of evidence, weighed them, and arrived at his decision. The ALJ acted within his discretion when analyzing the evidence and this Court will not overturn his assessment.

Plaintiff argues that Dr. Newman's testimony was inconsistent and uninformed and should not be treated as reliable medical evidence nor given greater weight than Dr. Elmes' report. In particular, Plaintiff claims that Dr. Newman: (1) incorrectly assumed that Plaintiff had not consulted a back expert; (2) disagreed with the conclusions of an examining physician (Dr. Elmes); (3) incorrectly assumed that Plaintiff had not tried using a back brace; and (4) both admits and denies that Plaintiff's scoliosis may be causing him pain. (Pl.'s Br. at 14.)

There were flaws in Dr. Newman's testimony. Dr. Newman incorrectly testified that, "There is no record that [Plaintiff has] seen a spine specialist. There are several prominent spine specialists in this city to get evaluation as to what possibly can be done." (R. at 77.) In fact, in April 2001, Plaintiff met with Dr. DeWald, a spine specialist, who ordered an MRI of Plaintiff's spine. (R. at 298-99, 305.) The evidence also indicates that, in August and September of 2002, Plaintiff was referred to an orthopedic spine specialist, (R. at 349, 356-57), and scheduled appointments with spine specialists for November 14, 2002, and November 21, 2002. (R. at 359-60.) The record does not reflect whether the November 2002 appointments took place but Plaintiff did have another meeting with Dr. DeWald on December 2, 2002, (R. at 372), at which time surgical options were discussed. (R. at 105-06, 372.) Nonetheless, Dr. Newman did not testify incompetently when he observed that Plaintiff had not obtained a specialist's evaluation of

his spinal condition. Plaintiff applied for DIB on August 20, 2000, alleging disability as of February 1, 1994. When analyzing Plaintiff's medical evidence, the ALJ identified the relevant time period as July 31, 1996, to present. (R. at 75.) The medical evidence, however, contains no record of Plaintiff meeting with a back specialist prior to April 2001. Furthermore, the bulk of Plaintiff's hospital visits over the years were for emergency care. (R. at 326-47.) While some tests were taken in the emergency care units, most of these visits resulted in refills of Plaintiff's pain medication but not referrals to back specialists. (R. at 329-32, 334-36, 338, 345.) Thus, Dr. Newman was not wrong to draw attention to the fact that, for the most part, Plaintiff was not in contact with spine specialists and that Plaintiff's medical record does not contain an evaluation by a spine specialist. (R. at 96-97.) The ALJ agreed with Dr. Newman's statements and found it significant that Plaintiff's contacts with treating sources were through emergency room visits, Plaintiff did not seek ongoing medical intervention for his back pain, and that referrals were rare. (R. at 41.)

Next, Dr. Newman's conclusions were different from Dr. Elmes' conclusions. As discussed above, mere divergence of opinion does not automatically make Dr. Newman's testimony suspect nor automatically entitle Dr. Elmes' conclusions to greater weight.

Dr. Newman addressed Plaintiff's back brace and found that it was not the type of brace best suited to Plaintiff's back problem. While Dr. Newman was initially uncertain whether Plaintiff used any back brace at all, as the hearing progressed the type of brace Plaintiff had attempted to use became clear. During the hearing, Plaintiff explained that he used a corset for support, which is different than the TLSO brace that, according to Dr. Newman, offers the best support for people with spinal conditions. (R. at 93-95, 107-08.) After Dr. Newman's

- 27 -

assumptions regarding Plaintiff's back brace were corrected, it became clear that Dr. Newman considered Plaintiff's corset inadequate. (R. at 95.) Thus, any of Dr. Newman's misstatements regarding Plaintiff's back brace were addressed at the February 2003 hearing.

Finally, Dr. Newman testified that he believes Plaintiff's degenerative disc disease or bulging L5 disc is causing his back pain. Dr. Newman admitted that Plaintiff's scoliosis might be causing him some pain but ultimately believed that Plaintiff's scoliosis is a "red herring." (R. at 120.) Plaintiff interprets "red herring" to mean that the scoliosis is not causing Plaintiff pain. Dr. Newman's testimony, however, was not so blatantly inconsistent. Dr. Newman believed that both the scoliosis and the degenerative disc disease may cause Plaintiff pain, but concluded that the degenerative disc disease and bulging L5 disc were the more significant source of Plaintiff's discomfort. Attempting to keep the ALJ focused on the more significant sources of Plaintiff's pain, Dr. Newman referred to Plaintiff's scoliosis as a "red herring."

While the Court is not convinced that Dr. Newman's "red herring" remark demonstrates a significant flaw in his testimony, related inconsistencies discussed below do call some of Dr. Newman's conclusions into question. Specifically, inconsistencies regarding Plaintiff's credibility, treatment history, and allegations of pain undermine some of Dr. Newman's conclusions. Because Plaintiff's credibility will be reassessed, the ALJ should reconsider his decision to accept some of Dr. Newman's conclusions.

### D. The ALJ Made Credibility Findings.

The ALJ acknowledged that Plaintiff suffers from scoliosis and degenerative spine disease but found Plaintiff's complaints of frequent and intense pain to be not credible.

Similarly, the ALJ rejected Plaintiff's claim that pain-killing medication makes him too drowsy to hold a job. Plaintiff argues that: (1) medical evidence supports his allegations of severe pain; (2) Dr. Elmes and other SSA physicians found Plaintiff's complaints of pain to be credible and consistent with his medical impairments; and (3) drowsiness is a common side effect of his prescription medications. (Pl.'s Br. at 14-15.) The Commissioner rejects Plaintiff's argument and states that objective medical findings, Plaintiff's conservative treatment regimen of pain medication, and Plaintiff's participation in three hearings cast doubt on Plaintiff's claim that his back condition is disabling. (Def.'s Br. at 10.) Furthermore, the Commissioner argues that, to the extent Plaintiff's complaints were credible, the ALJ's final decision accommodated Plaintiff's pain. (Id.)

When assessing credibility, resolution of competing arguments based on the record is for the ALJ, not this Court. *Donahue v. Barnhart*, 279 F.3d 441, 444 (7th Cir. 2002). On appeal, the ALJ's credibility findings will not be disturbed unless they are patently wrong. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). But where, as here, Plaintiff produces medical evidence of an underlying impairment, the ALJ may not discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence. *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004); *Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003). Rather, the ALJ's reasons must be supported by record evidence and be sufficiently specific to make clear to the claimant and to any subsequent reviewer the weight given to Plaintiff's statements and the reasons for that weight. *Lopez*, 336 F.3d at 539-40. The ALJ must take care to articulate which information he relies upon when making his determinations and findings. *Zurawski*, 245 F.3d at 887 (ALJ must evaluate which allegations are credible and

- 29 -

which are not credible); *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (ALJ must

sufficiently articulate his assessment of the evidence to allow the court to trace the path of the

reasoning); *Zblewski v. Schweiker*, 732 F.2d 75, 78-79 (7th Cir. 1984) (where ALJ fails to

mention rejected evidence, the reviewing court cannot discern if significant evidence was

credited or simply ignored). Furthermore, the ALJ must consider specific factors when assessing

the credibility of an individual's statement. For example, under Social Security Ruling ("SSR")

96-7p,[4] the ALJ must consider: daily activities; the type dosage, effectiveness, and side effects of

medication taken by Plaintiff; treatment other than medication used to alleviate pain; and the

reasons Plaintiff may not seek treatment for the pain.[5] SSR 96-7p.

Plaintiff complained of back pain. Specifically, Plaintiff claimed that pain caused by his

scoliosis prevents him from: (1) standing in one place for more than fifteen minutes; (2) walking

more than a block; (3) lifting heavy objects; (3) bending; (4) climbing stairs; and (5) reaching

overhead. (R. at 109-11.) According to Plaintiff, pain also makes it difficult for him to maintain

his balance or sit for prolonged periods of time. (R. at 112.)

---

[4] Social Security Rulings are binding on all components of the SSA. 20 C.F.R.
§ 402.35(b)(1).

[5] SSR 96-7p, in its entirety, includes: (1) the individual's daily activities; (2) the location,
duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that
precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of
any medication the individual takes or has taken to alleviate pain or other symptoms; (5)
treatment, other than medication, the individual receives or has received for relief of pain or other
symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain
or other symptoms (e.g., lying flat on his or her back, standing for fifteen to twenty minutes every
hour, or sleeping on a board); and (7) any other factors concerning the individual's functional
limitations and restrictions due to pain or other symptoms.

Medical evidence establishes that Plaintiff suffers from scoliosis and degenerative disc disease. Several doctors found that Plaintiff's complaints of pain were reasonably consistent with scoliosis and degenerative disc disease. Dr. Hutchison's note in the RFC prepared by DDS physicians states that, "[Plaintiff's] pain allegations are credible as they radiate in an appropriate manner to his conditions. Thus, [Plaintiff] has been restricted to light work." (R. at 297.) Dr. Elmes reported that, during his examination of Plaintiff, Plaintiff complained of low back pain and shoulder pain caused by walking, calf, back and hip pain caused by toe-standing, heel-standing and hopping, and right shoulder pain. (R. at 316.) According to Dr. Elmes, Plaintiff's problems included non-specific thoracic and lumbar back pain, nonspecific right shoulder pain, and headaches, etiology undetermined, possibly caused by high blood pressure. (R. at 317-18.) Additionally, Plaintiff has been prescribed numerous pain-killing medications and has, in the last few years, been referred to back specialists.

The ALJ credited some of Plaintiff's complaints of pain and made some accommodations for that pain when he placed limitations on Plaintiff's ability to sit, stoop, twist, balance, kneel, climb, and perform overhead tasks. (R. at 44.) These accommodations did not address all of Plaintiff's complaints of pain, however, as the ALJ, relying heavily on Dr. Newman's testimony, found Plaintiff's complaints regarding intensity, frequency, and duration of pain not credible. The ALJ agreed with Dr. Newman that, "[Plaintiff's] scoliosis was not more than medically mild because of its functional impact upon [Plaintiff]." (R. at 39.) To reach this conclusion, Dr. Newman challenged Dr. Elmes' acceptance of Plaintiff's complaints of pain, as well as the correlation between the pain noted by Dr. Elmes and Plaintiff's alleged impairments. Dr. Newman explained that, while Plaintiff's spine was deformed, the top and bottom of the

spine were still aligned, making it possible for Plaintiff to perform most activities without pain normally associated with more severe scoliosis or disc degeneration. (R. at 85-86.) Dr. Newman also pointed out that Plaintiff only had one measurement taken of his scoliosis and that measurement was only forty-three degrees, which is not considered severe. Because he considered Plaintiff's medical indications not severe and because Plaintiff had not sought more aggressive treatment for pain, Dr. Newman concluded that Plaintiff's impairments would not result in serious functional limitations. The ALJ found Dr. Newman's opinion consistent with his own observations of the claimant at three hearing sessions: "the claimant briskly walked in and out of the hearing room, and never displayed obvious physical distress." (R. at 39.)

The ALJ erred in relying on Dr. Newman's conclusions regarding Plaintiff's pain because much of Dr. Newman's testimony regarding Plaintiff's pain was based on test results that he himself questioned. At the beginning of the hearing, Dr. Newman stated that the accuracy of the forty-three degree measurement of Plaintiff's spine was questionable given that Plaintiff's scoliosis was visible, (R. at 78), and that x-rays and MRIs demonstrated that Plaintiff had degenerative changes at the apex of the scoliosis and described the scoliosis as prominent. (R. at 96.) Furthermore, Plaintiff testified that a back specialist discussed surgically implanting rods in Plaintiff's spine, an operation that Dr. Newman says is ordinarily reserved for patients with a curvature of sixty degrees or more. (R. at 80.) When asked whether such an operation was compatible with Plaintiff's scoliosis, Dr. Newman stated:

> "If its only 43 degrees, I'd say no, he shouldn't need that, but the contradictory thing is that he does have degenerative changes at the apex of the scoliosis demonstrated by x-ray and MRI and yet, he only has a very minor scoliosis, according to the measurements, so I don't know. There's contradictory evidence."

(R. at 96.) Dr. Newman continued, "if he does have pain from the scoliosis, we don't know whether his pain's coming from the scoliosis or from that L5 disc." (Id.) Additionally, Dr. Newman repeatedly stated that his opinions would be more informed if a conventional measurement of Plaintiff's scoliosis was taken, (R. at 76, 78), if back specialists examined Plaintiff and submitted medical findings regarding his spine, (R. at 96-97), and if the record contained information on the effects of Plaintiff's gunshot injury on his scoliosis. (R. at 99-100.) Given the lack of evidence and the contradictory evidence, Dr. Newman admitted that there was "a certain amount of . . . guess work" in his testimony. (R. at 96.)

Despite his lack of confidence in the forty-three degree measurement, Dr. Newman relied on it in his analysis. For example, Dr. Newman stated, "[Plaintiff's] back pain may be coming entirely from his L5 disc and not from his scoliosis. According to Dr. Elms' [sic] measurements, the scoliosis is not severe; it's mild, 43 degrees." (R. at 79.) Similarly, Dr. Newman often based his conclusions regarding Plaintiff's back pain on the structural evidence contained in the record. (R. at 75, 77, 85-86, 96, 101.) For example, at the beginning of the February 2003 hearing, Dr. Newman said, "I can describe the structural trouble. I can't exactly pinpoint how much pain he has. In itself, the structural problems would not cause any great difficulty in ordinary ambulation." (R. at 77.) And later, Dr. Newman discounted Plaintiff's complaints of constant hip pain due to a lack of "structural evidence." (R. at 101.) The structural evidence Dr. Newman analyzes, however, includes the forty-three degree measurement of the curvature of Plaintiff's spine that he found unreliable. Furthermore, Dr. Newman's theories could not explain Plaintiff's complaints of constant hip pain, nor his pain associated with coughing, sneezing, urinating, and defecating ("[t]hat wouldn't be from the degenerative disc disease . . ."). (R. at 97-98.) In short,

it appears that Dr. Newman could not provide conclusive testimony regarding Plaintiff's complaints of pain and his testimony reflects the fact that the record lacks sufficient evidence to reach an accurate credibility determination. This is especially true in light of the medical evidence that supports Plaintiff's complaints of pain. Because the ALJ relied heavily on Dr. Newman's unreliable remarks regarding Plaintiff's condition, the ALJ's pain assessment must be reconsidered.

Plaintiff also argues that his pain medication makes him too drowsy to work. Plaintiff draws attention to the fact that known side effects of his medication may include drowsiness. The ALJ refused to credit Plaintiff's complaints of side effects of medication or complaints of frequent, intense headaches precipitated by episodes of intense musculoskeletal system pain (R. at 41), noting that Plaintiff's allegations were not corroborated by medical evidence and that Plaintiff demonstrated an ability to concentrate, understand, and respond appropriately at all three ALJ hearings. (Id.) In light of the findings above, and the possibility of new medical evidence in the future, Plaintiff's complaints of pain, headaches, and adverse effects of medication should be reconsidered on remand.

For the reasons stated above, the Court remands the case and instructs the ALJ to arrange for a scoliosis curvature test using the "Cobb method" as well as any other testing and questioning necessary to evaluate Plaintiff's condition and allegations of pain. This may include evaluation of the medical treatment sought by Plaintiff, Plaintiff's need for pain-killing medication, and any adverse effects of pain-killing medication on Plaintiff's ability to work.

## V.  Conclusion

For the reasons stated above, Defendant's motion is denied and Plaintiff's motion is

granted to the extent set out above.

**ENTER ORDER:**

**MARTIN C. ASHMAN**
United States Magistrate Judge

Dated:  August 12, 2005.

Copies have been mailed to:

ROBERT C. KIELIAN, Esq.
M. JACQUELINE WALTHER, Esq.
Kielian & Walther, P.C.
33 West Jackson Boulevard
Suite 201
Chicago, IL 60604

Attorneys for Plaintiff

MS. CATHERINE A. SEAGLE
Special Assistant United States Attorney
20 West Adams Street
Suite 3000
Chicago, IL 60606

Attorney for Defendant